**Juan SANTONI, Jr., and William T. Clemons and his wife Aida Clemons, etc., Plaintiffs,**

v.

**FEDERAL DEPOSIT INSURANCE CORPORATION, Defendant.**

Civ. No. 80–1712.

United States District Court,
D. Puerto Rico.

March 2, 1981.

Lee & Brucueras, San Juan, P. R., for plaintiff.

Roberto Boneta, San Juan, P. R., for defendant.

## OPINION AND ORDER

GIERBOLINI, District Judge.

Plaintiffs tried to buy the Le Petit Hotel from defendant Federal Deposit Insurance Corporation (FDIC) but the hotel was sold to another party. Plaintiffs now claim $1,025,000 in damages for loss of profits, income and expenses.

After filing its answer to the complaint on October 2, 1980 the FDIC filed a *motion* seeking the dismissal of the action, asserting that plaintiffs' claims which were premised upon an alleged abuse of discretion and misrepresentation on the part of the FDIC in the sale of the Le Petit Hotel were expressly barred by the Federal Tort Claims Act, Section 2680(a) and 2680(h) of Title 28 U.S.C. Defendant also moved for summary judgment claiming that since the plaintiffs never submitted a *bona fide* offer, the issues raised were susceptible of being disposed of by summary judgment.

The plaintiffs opposed the motion to dismiss and for summary judgment and accompanied a sworn statement of plaintiff Clemons and certain documents in support of their opposition. Plaintiffs essentially claim that the Federal Tort Claims Act immunities are not applicable by claiming that their complaint does not sound in tort but rather rests upon an alleged breach of an implied *contract* and that there exist genuine issues and controversies of material facts which preclude the disposition of the case under Rule 56 FRCP.

Upon a review of the sworn statements and documents filed by both parties the Court finds that the defendant in its corporate capacity acquired and held for liquidation a former asset of the closed Banco Crédito y Ahorro Ponceño known as the Le Petit Hotel, located in the Condado section of San Juan, Puerto Rico. The asset was composed of a 1,636 square meter lot which contained a 10-story building built in 1969. The building was used for less than a year after being constructed and was then abandoned and neglected. The annual estimated holding expenses to the FDIC were calculated at $96,476.00, which included property taxes, insurance, guard services, maintenance, depreciation and temporary shoring to prevent the collapse of the structure.

As a result of these expenses and the rapid deterioration of the structure, the FDIC decided to attempt to sell the asset. Pursuant to a published notice for closed bids, an auction was held and no bids were received, either from plaintiff or any other interested purchaser.

Prior to the auction plaintiff Clemons communicated with the FDIC and expressed his interest in negotiating a purchase of the property and suggested that public auction or open negotiations be adopted by defendant. The FDIC responded in writing and stated the following:

"To state that the FDIC will obtain a higher price and/or terms in a public auction is non-supportive. All concerns will probably submit their best bid and the FDIC will have the option to reject any or all bids and to reschedule another bidding.

"Furthermore, we feel that open negotiations with bidders does not necessarily mean that the best offer and/or terms can be achieved, as previously mentioned, the FDIC has the option to reject any and all bids and please be assured that the FDIC will treat all parties fairly and equitably and thereby eliminate any suspicion of collusion on behalf of this Federal Government agency."

In that communication the FDIC also expressed that "[t]hose parties interested in bidding should have their financing limit approved by another lending institution prior to the bidding date."

The sworn statement of plaintiff Clemons is to the effect that the plaintiffs made an offer to purchase the property for $400,000 and that this offer was flatly rejected, the FDIC insisting that the minimum price it would accept was $490,000. There is no controversy that the plaintiffs offered to purchase the property for $490,000 and that this offer was rejected by the FDIC because the terms proposed by the plaintiffs were unacceptable. The reasons for the rejection of the offer were that the plaintiffs failed to obtain a commitment for financing, did not accompany an earnest money deposit and conditioned any such deposit to obtaining a commitment for financing.

It seems that as of September 18, 1979 the plaintiffs were still negotiating the financing terms and attempting to modify the terms set by the financing institution. Clearly, no financing was yet available.

At a time in which no firm cash offer existed from plaintiffs or anyone else, the FDIC received a written offer with a $35,-000 cash deposit from a Mr. George Kogan to purchase the property for a total cash price of $350,000. The FDIC liquidators tentatively accepted Mr. Kogan's offer subject to the approval of the FDIC's Board of Directors and reserving to the FDIC, in its sole discretion, the final acceptance or rejection of that offer. Thereafter, the Board of Directors of the FDIC approved the sale to Mr. Kogan for the amount of $350,000.

Plaintiffs never made a firm cash offer to purchase the asset and because of its terms their other offer was flatly rejected by defendant.

There are no allegations nor any indication in the record that the sale to Kogan was collusive or that the negotiations with the plaintiffs were a mere sham. Furthermore, the FDIC did not violate any published rules or regulations in its negotiations and in the sale of the asset.

Plaintiffs did not acquire any exclusive rights to purchase the property and the FDIC made no representations that the identity of competing offerors or the content of their offers would be communicated to the plaintiffs.

There is no indication in the record that the decision to accept the $350,000 offer was the result of anything but the exercise of the FDIC's discretion to sell the asset for those terms and conditions it deemed acceptable. Plaintiffs were aware at all times that the FDIC reserved its right to accept or reject any and all offers.

There never existed a binding contract nor specific commitments between the plaintiffs and the FDIC.

While Section 1819(4) of the Federal Deposit Insurance Act, 12 U.S.C. § 1819(4) vests the FDIC with the capacity to "sue and be sued", this section is not an unqualified waiver of sovereign immunity since Section 2679(a) of Title 28 U.S.C. specifically provides that the authority of any federal agency to sue and be sued cannot be construed to authorize suits against federal agencies which are cognizable under Section 1346(b) of Title 28 U.S.C. It is well settled that claims for money damages which sound in tort must be brought against the United States and not against the FDIC. *Safeway Portland EFCU v. FDIC,* 506 F.2d 1213, 1215–1216 (9 Cir., 1974); *Magellsen v. FDIC,* 341 F.Supp. 1031, 1033 (D.Mont., 1972); *James v. FDIC,* 231 F.Supp. 475, 477 (W.D.La., 1964); *Freeling v. FDIC,* 221 F.Supp. 955, 956 (W.D.Okl., 1962), aff'd 326 F.2d 971 (10 Cir., 1963).

Pursuant to Sections 2680(a) and 2680(h) of the Federal Tort Claims Act, Title 28 U.S.C., claims against the United States based upon the exercise, performance, or even abuse of discretion, and claims based upon misrepresentation or deceit are expressly barred. Plaintiffs concede that if their action were to sound in tort it would be barred, but prefer to typify their action as contractual in nature. The difficulty with this allegation is that the evidence in the case denies the existence of a contract or of any commitment between the parties.

Plaintiffs merely claim that they were induced to prepare and make a bid by the FDIC and that the FDIC breached its promise to fairly consider all offers by not informing plaintiffs of a decision to sell the asset for a lower price. It seems that this case lies in a region of uncertainty between contract and tort. But due to the limited extent to which the United States has waived sovereign immunity and consented to be sued, this Court is required to face that issue when the Government is the defendant in a suit for damages. *Scanwell Laboratories, Inc. v. Thomas*, 521 F.2d 941, at 947 (D.C.C.A., 1975). In both *Edelman v. FHA*, 251 F.Supp. 715, 719 (E.D.N.Y., 1966), aff'd. 382 F.2d 594 (2 Cir., 1967) and *Rapp v. Salt Lake City*, 527 P.2d 651, 655 (Utah, 1974) the Court found that cases similar to this sounded in tort.

■ But before passing upon whether or not this action properly states a contractual cause of action, it should be noted that some of the damages sought cannot be recovered even under the contractual theory. Plaintiff claims that it is entitled to both bid preparation costs and lost profits. However, in cases involving claims of this nature it is improper to award lost profits since the contract under which plaintiff would have made such profits never actually came into existence. *Keco Industries, Inc. v. United States*, 192 Ct.Cl. 773, 428 F.2d 1233 (1970), at 428 F.2d 1240; *Heyer Prods. Co. v. United States*, 140 F.Supp. 409, 412; 135 Ct.Cl. 63, 69 (1956).

■ Plaintiffs' theory of an implied contract seems to be based upon some cases deciding that a disappointed bidder has a right to recover the expenses incurred by him in preparing a response to a government agency solicitation under certain conditions. Without exception these cases involve bids on government procurement contracts in which the rejection of a bid involved arbitrary or capricious actions on the part of the government or its officials. The best analysis of the criteria controlling claims for bid preparation costs is found in *Keco Industries, Inc. v. United States*, 492 F.2d 1200 (Ct.Cl., 1974) at pages 1203–1204.

There the Court found that the following should be present:

(1) bad faith on the part of the procuring officials;

(2) "no reasonable basis" for the administrative decision;

(3) that the degree of proof of error necessary for recovery is related to the amount of discretion entrusted to the procurement official by statutes and regulations; and

(4) a proven violation of pertinent statutes or regulations can, but need not necessarily, be a ground for recovery.

From the uncontested facts of this case we find that the above mentioned criteria are not present. There was no violation of any published regulations. In fact, there are no published regulations governing the FDIC's liquidation activities. See *Ainslie Corp. v. Middendorf*, 381 F.Supp. 305, 308 (D.C.Mass., 1974). We should keep in mind that liquidations like the ones before us and cases involving formal invitations for bids or procurement activities are not analogous. The former are oriented in a substantial part to liquidating for cash the various assets of a closed bank acquired by the FDIC in its corporate capacity as quickly as possible. The latter are ongoing processes, with little or no similarity to the former.

There are no allegations, and the record does not show that the FDIC's officials acted in "bad faith". Under these circumstances, it cannot be said that the FDIC acted arbitrarily, unreasonably or capriciously.

Plaintiffs contend, however, that the FDIC's representation to the effect that it would "treat all parties fairly and equitably" implied an obligation to keep the plaintiffs informed not only of competing lower offers but of internal FDIC decisions to negotiate for a lower price than it is alleged was stated to the plaintiffs. We disagree. The argument goes too far.

In cases involving the sale of lands or other properties, the government retains the discretion to reject or accept any offers it deems proper in the exercise of its discre-

tion. Even in cases involving public auction situations, no contract arises until a bill of sale is issued to the successful bidder. *Willcoxson v. United States*, 313 F.2d 884 (D.C. C.A., 1963); *Ferry v. Udall*, 336 F.2d 706 (9th Cir., 1964). In *Ferry, supra,* the Court commenting on the discretion vested in the Secretary of the Interior to sell upon whatever terms, conditions or manner of sale he deems necessary, stated the following:

> "Since the Secretary has discretionary power to refuse to sell at all, he also has authority to set any conditions, consistent with the Act, upon which the sale may be made. (Citations omitted.) If the appellant did not like the system the Secretary established for entertaining bids, their remedy was that of not bidding at all."

See also *Jones v. TVA*, 334 F.Supp. 739 (M.D.Fla., 1971). In *Diercks v. Federal Savings and Loan Insurance Corporation,* 528 F.2d 916 (7th Cir., 1976) the Court construed 12 U.S.C. Sections 1821 and 1822, also involved herein, as a clear indication that Congress intended the internal affairs of the Federal Savings and Loan Insurance Corporation (an agency very similar to the FDIC in function and operation), such as the making of contracts, to be left to its unfettered discretion.

*Edelman v. FHA*, 382 F.2d 594 (2d Cir., 1967) presents facts similar to the case now before us and discusses the issue of whether any implied contract could be said to exist in a case involving the sale of government property. In that case the ultimately successful bidder submitted an offer at a specified price which was initially rejected. The FHA then went out on a public auction to be conducted with FHA procedures for a modified form of auction but without indicating any minimum price. After opening the sealed bids all bidders were permitted to increase their bids orally. Plaintiff was second best. All bids were then rejected as less than the authorized minimum and through subsequent private negotiations of which the plaintiff was not aware, the property was sold to the party which had made the original purchase offer. The Court specifically rejected the existence of any implied contract under these circumstances. The Court stated at page 598 that:

> "It can hardly be contended on the facts of this case that the FHA entered into such a broad contract. What appellant seeks is judicial review of an allegedly improper sale by the FHA and there is no question that the Courts do not possess that power."

As stated before, plaintiffs had no financing at the time of their two initial offers to purchase the property and their offers were rejected, partly due to the fact they made no further unconditional cash offers to purchase the property for $490,000 or any other price. At that point, defendant was clearly entitled to convert the asset for cash at whatever price, in its discretion, it found acceptable.

In view of the above we find that this action does not involve a contractual claim and is therefore barred under the provisions of Sections 2680(a) and 2680(h) of Title 28 U.S.C.

It is well settled that the party moving for summary judgment has the burden of demonstrating that the test contained in Rule 56(c) of the Federal Rules of Civil Procedure that "no genuine issue as to any material fact" is satisfied, and that he is entitled to judgment as matter of law. See 10 Wright and Miller, Sec. 2727, p. 524, and *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Mack v. Cape Elizabeth School Board*, 553 F.2d 720 (1st Cir., 1977); *Kellerman v. Askew*, 541 F.2d 1089 (5th Cir. 1976); *Charpentier v. Fluor Ocean Servs. Inc.*, 534 F.2d 71 (5th Cir. 1976). Defendant has carried its burden.

Thus, plaintiffs' motion for summary judgment is DENIED. Defendant's motion for summary judgment is GRANTED.